# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº11-CV-4770 (JFB)
_____

JOHN A. CLIFFORD,

Plaintiffs,

VERSUS

UNITED STATES COAST GUARD AND UNITED STATES OF AMERICA,

Defendants.

_____

**MEMORANDUM AND ORDER**
January 10, 2013
_____

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff John A. Clifford ("Clifford" or "plaintiff") commenced this action against the United States Coast Guard ("Coast Guard") and the United States of America (collectively, "defendants") pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701-706 (the "APA"), seeking review of the Coast Guard's decision denying him a merchant mariner credential with an officer endorsement as a master.[1] Plaintiff alleges that the Coast

Guard's decision to deny him a credential as a master due to his diagnosis of a moderate area of ischemia, because of the Coast Guard's concern that this blood condition could lead to heart attacks, was an abuse of discretion.

Defendants now move for a judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).[2] Plaintiff opposes that

---

[1] In his complaint, plaintiff also alleges that the Coast Guard's interpretation of its regulations as applied to him violated the Americans with Disabilities Act and the Rehabilitation Act of 1973, and that the Coast Guard violated his due process and equal protection rights under the Constitution and the laws of the United States. (Compl. at 2, 25) However, in his opposition to defendants' motion to dismiss and cross-motion for summary judgment, plaintiff states that he is not seeking relief under the Americans with Disabilities Act or the Rehabilitation Act, but that his

complaint "only seeks relief under the APA and Equal Access to Justice Act . . . ." (Pl.'s Opp'n at 5.) In his reply, plaintiff again states that he "seeks relief only under the Administrative Procedure Act and the Equal Access to Justice Act." (Pl.'s Reply at 20.) Thus, plaintiff has withdrawn all claims except those under the APA and Equal Access to Justice Act. To the extent that plaintiff's reply vaguely suggests that he is still asserting a violation of the Fifth Amendment (notwithstanding the above-referenced statements), the Court addresses that claim, *infra* Part IV, in an abundance of caution, and finds the claim to be without merit.

[2] Defendants also move to dismiss plaintiff's claims under the Americans with Disabilities Act and the

motion and moves for summary judgment. For the reasons set forth below, the Court grants defendants' motion in its entirety, and denies plaintiff's cross-motion for summary judgment.

Specifically, the Court concludes that the Coast Guard's decision with respect to plaintiff's application, rendered pursuant to the statutory authority of 46 U.S.C. § 7101, and in accordance with the guidance provided by 46 C.F.R., Chapter 1, Subchapter B. and NVIC 04-08, is reasonable and should not be disturbed under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). First, the determination, as evidenced in the over 500-page record (containing plaintiff's medical records and other materials) was extremely thorough and involved an individualized assessment of plaintiff's condition. The record indicates that plaintiff submitted the results of three separate maximal myocardial perfusion stress tests and, in all three tests (including two that took place after his heart surgery) there were findings of an abnormal myocardial perfusion and a moderate area of ischemia. The Court Guard, which by regulation must ensure that an applicant for a master credential has no condition that would pose an inordinate risk of sudden incapacitation or debilitating complication, regards ischemia on a stress test to be a risk to maritime and public safety. In addition, when contacted by the reviewing physician from the Coast Guard, plaintiff's treating cardiologist was unable to give the Coast Guard any assurance that plaintiff did not have an increased risk of incapacitation or death due to his ischemia. Based upon a review of the medical information, plaintiff was advised that "[t]he reviewing physician believes that as a result of your known coronary artery disease and moderate

ischemia on myocardial perfusion scanning, you have a significant risk of cardiac death or non-fatal heart attack that has the potential to significantly affect your ability to safely operate a vessel." (Administrative Record, Docket Entry #15 ("R.") at 2.) Thus, the Coast Guard's thoroughness is evident in the structured process by which it analyzed plaintiff's medical documentation in light of the relevant data, which even included contacting plaintiff's treating cardiologist. Moreover, there is certainly a rational connection between the evidence submitted to the Coast Guard and the decision that plaintiff's cardiac condition posed an inordinate risk of sudden incapacitation or debilitating complication that could endanger the safety of the public and the maritime environment. In short, there is no basis to disturb the Coast Guard's reasonable determination in this case.

Plaintiff's opposition and cross-motion is primarily devoted to his attempt to show that the Coast Guard ignored medical studies and other information that he believes supports his position. As a threshold matter, plaintiff has failed to establish any grounds in this case – such as bad faith, improper behavior on the part of the agency, or an absence of formal findings – which would allow this Court to consider evidence outside the record. In any event, the Court has reviewed plaintiff's extra-record evidence and concludes that, even if all of his additional evidence is considered, there is still no basis to undermine the persuasiveness of the agency decision under *Skidmore*. Plaintiff points to no evidence, either individually or collectively, that suggests the determination was unreasonable. Accordingly, defendants are entitled to judgment on the pleadings with respect to plaintiff's challenge under the APA.

---

Rehabilitation Act, but as stated *supra* n.1, plaintiff is no longer advancing a claim under those statutes.

## I. BACKGROUND

### A. Factual Background

The following facts are drawn from the administrative record submitted by defendants. As a review of the record and plaintiff's complaint demonstrates, plaintiff challenges the defendants' interpretation of the applicable statute and regulations and the adjudication of his application based upon the factual record.

To legally work aboard a United States merchant marine vessel, individuals must receive a merchant mariner credential ("MMC") from the National Maritime Center ("NMC"), the licensing authority of the United States Coast Guard. *See* 46 C.F.R. §§ 10.209, 10.225. On May 3, 2010, plaintiff applied for an MMC as a master, an ordinary seaman, a steward, and a wiper. (R. at 317-19.)[3]

As part of his application, plaintiff submitted his medical history. These documents revealed that plaintiff had a history of coronary artery disease and that he had underwent a coronary artery bypass graft in February 2009. (*Id.* at 345-47.)[4] Due to this history, the NMC requested that

plaintiff supply additional information, including the results from a "maximal myocardial perfusion exercise stress test performed within the last 12 months." (*Id.* at 334.) Later, the NMC clarified that this stress test must reach a level of intensity of Bruce Protocol 8.0 METS to demonstrate that plaintiff could safely operate a vessel as a master. (*Id.* at 425.)

Plaintiff submitted two stress test results, one from before his heart surgery, which reached the required levels of intensity but indicated abnormal myocardial perfusion and a moderate area of ischemia in the inferior wall, (*id.* at 429), and one from after his surgery, which did not reach the required levels of intensity and also indicated the abnormal myocardial perfusion and ischemia, (*id.* at 428).

On July 8, 2010, the NMC denied plaintiff's application due to "fail[ure] to reach the required 8 METS" on the stress test and the presence of "reversible ischemia." (*Id.* at 430.) The NMC stated that ischemia on a stress test "represents a risk to maritime and public safety." (*Id.*) Plaintiff requested reconsideration, stating that he had not eaten before the stress test because he had a blood test that day. (*Id.* at 433.) On August 10, 2010, the NMC denied his application for the same reasons, stating that the reconsideration request "does not provide[] any new objective evidence to mitigate the risk to maritime and public safety." (*Id.* at 434.) The ruling further stated that individuals must satisfy the required intensity level on a stress test because it is "medically related to the Mariner's ability to safely and adequately perform ordinary and emergency response shipboard functions aboard the vessel" and that the presence of cardiac ischemia "places you at risk for the sudden occurrence of an incapacitating

---

[3] Although plaintiff's application for all four positions was initially denied, the NMC subsequently reversed its decision, and granted plaintiff an MMC for ordinary seaman, steward, and wiper. (Defs.' Mem. at 1 n.1.) Therefore, this action seeks only a reversal of the agency decision denying plaintiff an MMC as a master.

[4] Plaintiff also revealed an additional medical condition for which he took medication. The NMC initially stated that this medication is "incompatible with safe maritime operations" and "[i]f clinically appropriate, an alternative treatment should be provided with documentation to us on such treatment." (R. at 334.) Because this record was filed under seal, and the NMC did not deny plaintiff's application due to the use of this medication, the Court is not being asked to review that particular determination.

cardiac event, which represents an unacceptable risk to maritime and public safety." (*Id.*)

Plaintiff appealed this decision to the Commandant, CG-54. (*Id.* at 438.) Plaintiff provided a new stress test that met the required intensity levels but still showed abnormal myocardial perfusion imaging and a moderate area of ischemia. (*Id.* at 439.) Plaintiff also submitted numerous medical studies in an attempt to prove that his condition did not place him at a greater risk of an incapacitating cardiac event, as well as research on the medical evaluator in his case, to demonstrate that the medical evaluator was not qualified to determine the seriousness of plaintiff's heart condition. (*Id.* at 278.) Plaintiff's cardiologist also spoke to the Coast Guard Appellate Medical Officer. (*Id.* at 85.)

Plaintiff's appeal was denied on April 18, 2011. Specifically, the Coast Guard stated that, while his stress test now reached the required level of intensity, plaintiff still had a moderate area of ischemia. (*Id.* at 1.) The decision did state that plaintiff's cardiologist said Clifford had been stable since his 2009 surgery, but that the cardiologist could not "give any assurance that [plaintiff] do[es] not have an increased risk of incapacitation or death due to [his] heart condition." (*Id.*) The Coast Guard determined that plaintiff's condition presented a "significant risk of cardiac death or non-fatal heart attack that has the potential to significantly affect [his] ability to safely operate a vessel." (*Id.* at 2.) The Coast Guard concluded that because the medical record revealed that plaintiff had a substantially increased risk of sudden incapacitation, he was "not suitable for work aboard a vessel in any capacity." (*Id.*)[5]

## B. Procedural History

Plaintiff originally brought this action in the Second Circuit Court of Appeals. Defendants moved to dismiss plaintiff's appeal for lack of jurisdiction. On September 28, 2011, the Second Circuit denied defendants' motion to dismiss the appeal for lack of jurisdiction, but transferred the action to this Court. Plaintiff filed a complaint on January 30, 2012, and defendants answered on April 2, 2012. On June 8, 2012, defendants filed their motion to dismiss and for judgment on the pleadings. Plaintiff filed his opposition to defendants' motion, as well as a cross-motion for summary judgment on July 9, 2012. Defendants filed their opposition to plaintiff's motion and reply in further support of their original motion on July 20, 2012, and plaintiff filed his reply on July 30, 2012. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

Section 702 of the APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. In its review, a court may:

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be –
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . .

5 U.S.C. § 706.

---

[5] As noted *supra*, the Coast Guard later reversed its decision in part, and determined that plaintiff was

medically fit for three of the four positions for which he applied, but that he could not be certified as a master. *See supra* n.3.

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Under Supreme Court and Second Circuit jurisprudence, "[w]hether a court defers to an agency's interpretation 'depends in significant part upon the interpretative method used and the nature of the question at issue.'" *Encarnacion v. Astrue*, 568 F.3d 72, 78 (2d Cir. 2009) (quoting *Barnhart v. Walton*, 535 U.S. 212, 222 (2002)). First, "[w]hen Congress has entrusted rulemaking authority under a statute to an administrative agency, we evaluate the agency's implementing regulations under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*," 467 U.S. 837 (1984). *Id.*

In *Chevron*, the Supreme Court set forth a two-step process to determine whether deference should be given to an agency's interpretation of its regulations and governing statutes:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at

issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. 837, 842-43 (1984) (internal citations and footnotes omitted). Further, the Court stated that, "[w]e have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations." *Id* at 844.

In 2001, the Supreme Court considered the limits of *Chevron* deference owed to administrative practice in applying a statute in *United States v. Mead Corp.*, 533 U.S. 218 (2001). In *Mead*, the Court held that:

> [a]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*Id.* at 226-227. Thus, *Chevron* deference is generally unwarranted where a policy is not

contained in the regulations themselves or another format authorized by Congress for issuing legislative rules, but rather is explained in an informal source, such as a training manual. *See, e.g.*, *Estate of Landers v. Leavitt*, 545 F.3d 98, 106 (2d Cir. 2009) ("Although nonlegislative rules are not per se ineligible for *Chevron* deference as a general matter, we are aware of few, if any, instances in which an agency manual, in particular, has been accorded *Chevron* deference.").

However, as the Second Circuit has noted, pursuant to *Auer v. Robbins*, 519 U.S. 452 (1997), "[a] similar deference applies when an agency interprets its own regulations." *Encarcion*, 568 F.3d at 78. More specifically, "[t]hat interpretation, regardless of the formality of the procedures used to formulate it, is 'controlling unless plainly erroneous or inconsistent with the regulation[s].'" *Id.* (quoting *Auer*, 519 U.S. at 461).

Finally, "[e]ven if neither *Chevron* nor *Auer* applies, an agency's interpretation is still entitled to respect according to its persuasiveness under *Skidmore v. Swift & Co.*," 323 U.S. 134 (1944). *Encarcion*, 568 F.3d at 78 (internal citation and quotation marks omitted). The weight given to an interpretation under *Skidmore* "depends 'upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* at 79 (quoting *Skidmore*, 323 U.S. at 140).

Defendants contend that a judgment on the pleadings is the appropriate vehicle for resolving an appeal of an agency's decision under the APA. (*See* Defs.' Opp'n at 1 n.1.) Plaintiff filed a motion for summary judgment because he attached to his moving

papers material from outside the record. (*See* Pl.'s Opp'n at 5.) Plaintiff claims that these materials prove that the Coast Guard has "recognized the defects in their new guidelines, and established a committee to correct those mistakes." (*Id.*)

The Tenth Circuit has explicitly held that because motions for summary judgment require the court to look outside the administrative record, these motions are "conceptually incompatible with the very nature and purpose of an appeal [from an agency decision]." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). However, other courts disagree with that analysis. *See, e.g., Maine v. Norton*, 257 F. Supp. 2d 357, 363 (D. Me. 2003) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, even though the court does not employ the standard of review set forth in Rule 56.").

Although not ruling directly on the issue, the Second Circuit has allowed appeals of agency decisions to be styled as motions for summary judgment, *see, e.g.*, *Henley v. FDA*, 77 F.3d 616 (2d Cir. 1996), while also stating that "[g]enerally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision," *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Florida Power & Light Co. v. Lorion,* 470 U.S. 729 (1985) and *Camp v. Pitts*, 411 U.S. 138 (1973)).

In short, with respect to an APA claim, whether the defendant styles the motion under Rule 12 or Rule 56 of the Federal Rules of Civil Procedure, it is clear that the court reviewing the agency decision can consider the administrative record and

generally should confine its review to such record. However, the Second Circuit has stated that:

> An extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice.

*Id.* (citing *Citizens to Preserve Overton Park, Inc v. Volpe*, 401 U.S. 402, 420 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

In the instant case, whether the motion is styled as a summary judgment motion (as plaintiff has done) or a motion for judgment on the pleadings (as defendants have done) is of no legal significance because this Court concludes that none of the above-referenced grounds for an extra-record investigation by the reviewing court have been met in this case. *See, e.g., Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[T]he question of whether the agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record, regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment."); *Univ. Med. Ctr. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) ("[T]he question whether [an agency] acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record – regardless of whether it is presented in the context of a motion for judgment on

the pleadings or in a motion for summary judgment (or in any other Rule 12 motion under the Federal Rules of Civil Procedure)."); *accord Schwalier v. Panetta*, 839 F. Supp. 2d 75, 81 (D.D.C. 2012).

Plaintiff has introduced no evidence of bad faith, improper behavior on the part of the agency, or an absence of formal findings which would allow the Court to consider evidence outside the record under the above-referenced Second Circuit authority. Thus, the Court's review should be confined to the administrative record, without reference to evidence outside the record. The Court has, however, in an abundance of caution, reviewed the additional evidence submitted by plaintiff and, even if the Court were to consider as part of its review all of the additional information outside the record that plaintiff has supplied to this Court, it would not alter the Court's conclusion that there is no basis to disturb the Coast Guard's determination in this case.[6]

---

[6] Plaintiff states that the administrative record is missing medical studies that he supplied to the Coast Guard, and that some of the record was modified after the agency made its final decision (with an updated version of one of the medical studies). (Pl.'s Opp'n at 1 n.1.) First, the Coast Guard updating one of the studies in the record would not constitute a "strong showing" of bad faith, let alone any evidence of such. In fact, plaintiff fails to cite any substantive differences in the updated study. Second, with respect to the alleged missing studies, the record contains hundreds of pages of medical studies that plaintiff supplied to the Coast Guard, and plaintiff has failed to articulate how these additional studies are any different from those contained in the record. In any event, even though plaintiff has not provided a basis for an extra-judicial investigation by this Court, the Court has reviewed all of plaintiff's additional evidence, including the additional studies, in an abundance of caution, and concludes that it does not alter the Court's decision. For example, plaintiff points to Executive Order #12866, Regulatory Planning and Review, signed by President Clinton, and documents from the Merchant Mariner Medical Advisory Committee, which state that the Coast Guard is considering revising NVIC 04-08. Even if

III. DISCUSSION

A. The Statute and Regulations

Title 46, Section 7101 of the United States Code provides that:

(a) Licenses and certificates of registry are established for individuals who are required to hold licenses or certificates under this subtitle.

(b) Under regulations prescribed by the Secretary, the Secretary—
(1) issues the licenses and certificates of registry; and
(2) may classify the licenses and certificates of registry . . .

(c) The Secretary may issue licenses in the following classes to applicants found qualified as to age, character, habits of life, experience, professional qualifications, and physical fitness:
(1) masters, mates, and engineers.
(2) pilots.
(3) operators.
(4) radio officers.

(d) In classifying individuals under subsection (c)(1) of this section, the

Secretary shall establish, when possible, suitable career patterns and service and other qualifying requirements appropriate to the particular service or industry in which the individuals are engaged.

46. U.S.C. § 7101.

Pursuant to this section, the Secretary has enacted regulations detailing the requirements for MMCs. The regulations provide that "[t]o qualify for an MMC an applicant must meet the medical and physical standards in this section." 46 C.F.R. § 10.215(a). To qualify as a master, an individual must complete a general medical exam, which must "ensure that there are no conditions that pose an inordinate risk of sudden incapacitation or debilitating complication." *Id.* at § 10.215(d)(1). Myocardial infarctions (heart attacks) are listed as an example of a medical condition that could lead to disqualification. *Id.* If an applicant does not possess the physical condition necessary, the Coast Guard may grant a waiver "if extenuating circumstances warrant special consideration." *Id.* at 10.215(g).

Because the regulations are still quite broad, the Coast Guard has issued Navigation and Vessel Inspection Circular ("NVIC") No. 04-08, entitled "Medical and Physical Evaluation Guidelines for Merchant Mariner Credentials." (R. at 447).[7] The NVIC expressly states that it is not "itself a regulation," but is intended to provide "the Coast Guard's current thinking" on the medical requirements necessary to work aboard a merchant marine vessel. (*Id.* at 450.) This NVIC was created to "reduce the subjectivity of the physical and medical evaluation process and promote

---

plaintiff were allowed to supplement the record with this information, evidence that the Coast Guard is considering modifying its interpretation of its own regulation would have no bearing on the Court's decision in this case. Similarly, as discussed *infra*, plaintiff's additional medical studies do not undermine the Court's conclusion that the agency determination is entitled to deference under *Skidmore*. In short, plaintiff has failed to show bad faith by defendants in compiling the administrative record or any other basis for extra-record investigation and, in any event, his additional evidence does not alter the Court's legal analysis contained herein.

---

[7] All NVICs are available online at http://uscg.mil/hq/cg5/NVIC/2000s.asp#2008.

more consistent evaluations." (*Id.* at 448). Although it is not a regulation, a draft notice was given in the Federal Register and a notice-and-comment period ensued before the NVIC was finalized on September 29, 2008. *See* 71 Fed. Reg. 56,998; 73 Fed. Reg. 56,600.

### B.  Level of Deference

Plaintiff argues that the Court "should give little or no deference to the Coast Guard's decision" because no deference is warranted "[w]hen a court determines that the agenc[y's] interpretation has no persuasive force . . . ." (Pl.'s Opp'n at 18.) However, for the reasons set forth below, this Court concludes that the Coast Guard's interpretation of the statute and regulations was reasonable, and that the Coast Guard's adjudication of plaintiff's application was reasonable.

The Coast Guard's regulation interpreting Section 7101 is clearly entitled to *Chevron* deference. Because Congress did not explicitly speak to the requirements for licensing, the Court proceeds to step two in the *Chevron* analysis. As the Supreme Court held in *Mead*, *Chevron* deference is warranted "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." 533 U.S. at 226-27. Here, the statute states that the agency shall issue licenses "[u]nder regulations prescribed by the Secretary," and more importantly, that "the Secretary shall establish . . . other qualifying requirements" when issuing licenses for masters. 46 U.S.C. § 7101. Because Congress explicitly delegated authority to the agency to promulgate regulations and requirements for licensing masters, this Court "is obliged to accept the

agency's position" as long as "the agency's interpretation is reasonable." *Mead*, 533 U.S. at 229.

The regulation states that to qualify as a master, an applicant must pass a physical exam and the Coast Guard must "ensure that there are no conditions that pose an inordinate risk of sudden incapacitation or debilitating complication." 46 U.S.C. § 10.215(d)(1). The agency's regulation contained in 46 C.F.R. Section 10.215(a) is reasonable because it is a qualifying requirement aimed at promoting safety at sea.

However, NVIC 04-08 is not a regulation promulgated under the statute, but is instead a guide to assist the agency with interpreting its own regulation. Agency interpretations of its own regulations, "regardless of the formality of the procedures used to formulate it," receive a "similar deference" to *Chevron* deference unless they are "'plainly erroneous or inconsistent with the regulation[].'" *Encarnacion*, 568 F.3d at 78 (quoting *Auer*, 519 U.S. at 461).

The Supreme Court has stated that an agency interpretation of its own regulation is not entitled to the same level of deference when "instead of using its expertise and experience to formulate a regulation, it has elected merely to paraphrase the statutory language." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). Although plaintiff could argue that the agency regulation is unnecessarily broad and simply parroting the language of the statute, this is not a case where an agency has enacted a regulation that is nearly identical to the statute it is interpreting. Instead, the regulation is broad because mariner licensing is extremely complicated, and the Coast Guard is allowed

to create guidelines to assist with interpreting its own regulation.

Therefore, the Court holds that NVIC 04-08 is entitled to *Auer* deference, and that the Coast Guard's interpretation of its own regulation is reasonable and consistent with the regulation. Because the agency is primarily concerned with safety on the waters, and because a regulation cannot possibly contain every medical condition that could interfere with that goal, 46 C.F.R. § 10.215(d)(1) states that the general medical exam must determine that "there are no conditions that pose an inordinate risk of sudden incapacitation or debilitating complication." NVIC 04-08 is a reasonable interpretation that is consistent with this regulation because it is an attempt to make the Coast Guard's determinations of which applicants pose a risk to maritime safety more consistent.

Although the Coast Guard's interpretation of its regulations contained in NVIC 04-08 is entitled to deference, this determination does not end the inquiry because NVIC 04-08 does not require that an applicant with ischemia be denied a credential as a mariner. (*See* Defs.' Mem. at 21.) Instead, the NMC and the Coast Guard make an individualized determination of whether an applicant has demonstrated that he is not at high risk for sudden incapacitation or a debilitating complication. This is not a formal adjudication which would clearly be entitled to *Chevron* deference, *see Mead*, 533 U.S. at 230, because the statute does not require the hearing to be conducted on-the-record. *See, e.g., City of W. Chi., Ill. v. U.S. Nuclear Regulatory Comm'n*, 701 F.2d 632, 644 (7th Cir. 1983). Instead, the agency's decision constitutes an informal adjudication. The level of deference that applies to such proceedings is unclear. *See Doe v. Leavitt*,

552 F.3d 75, 79 (1st Cir. 2009) ("In the aftermath of the Court's opinion in [*Mead*], the level of deference owing to informal agency interpretations is freighted with uncertainty."). In *Mead* itself, the Court held that a tariff classification ruling by the United States Customs Service was not entitled to *Chevron* deference because it appeared Congress did not intend for the determinations to have "the force of law." 533 U.S. at 231-32. The Court stated that this was partially due to the fact that the agency issued over 10,000 of these decisions a year and each decision was only binding on the applicant, not on third parties. *Id.* at 233-34. Although the Court in *Mead* held that the informal adjudication at issue was not entitled to *Chevron* deference, courts have stated that *Mead* merely raises the question of whether the adjudication in the particular case before them is entitled to *Chevron* deference. *See, e.g.*, *Springfield, Inc v. Buckles*, 292 F.3d 813, 817-18 (D.C. Cir. 2002).

However, the Court does not need to decide whether the informal adjudication by the Coast Guard is entitled to *Chevron* deference after *Mead* because even under *Skidmore*, the agency's decision should be upheld. *See Springfield*, 292 F.3d at 818 ("Whether we follow *Chevron* or simply review the Director's statutory construction on the basis of *Skidmore* . . . is of no moment. The persuasiveness of the agency's reasoning . . . lead[s] us to the same result under either line of authority."); *see also Leavitt*, 552 F.3d at 80 ("[W]e agree with the district court that the level of deference is not determinative here; whether viewed through the prism of *Chevron* or the less forgiving prism of *Skidmore*, the Secretary's interpretation . . . withstands scrutiny.").

10

C. Application of *Skidmore* Deference
to Plaintiff's Adjudication

Under *Skidmore* deference, the weight given to an agency decision "depends 'upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Encarnacion*, 568 F.3d at 79 (quoting *Skidmore*, 323 U.S. at 140); *see also In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 83 (2d Cir. 2004) (stating that the factors that "inform" a *Skidmore* analysis include "the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgates its interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments." (internal citations and quotation marks omitted)). This level of deference "must mean something more than that deference is due only when an inquiring court is itself persuaded that the agency got it right [because] [o]therwise, *Skidmore* deference would not be deference at all." *Leavitt*, 552 F.3d at 81.

First, turning to the formality and thoroughness of the agency's decision, the NMC and the Coast Guard engaged in an extremely structured process for determining plaintiff's application. The agency engaged in a procedure that they appear to follow for every applicant, and plaintiff's application was reviewed by different levels within the agency. Plaintiff's right to appeal is also guaranteed by regulation, *see* 46 C.F.R. § 1.03-40, and an agency adjudication should be granted more deference when it follows from consistent procedures with a right of appeal. *See Leavitt*, 552 F.3d at 81. The agency's decision was also quite thorough. Numerous doctors reviewed plaintiff's medical records, and plaintiff was

given the opportunity to submit additional records. The doctors also reviewed the voluminous medical literature that plaintiff submitted, and one of the doctors spoke to plaintiff's cardiologist on the phone.

It is difficult for this Court to determine whether the agency has been consistent in their determination that an applicant with ischemia may not receive a license as a master. The agency has issued NVIC 04-08 in an attempt to bring more consistency to this process, and while NVIC 04-08 does not mandate that an applicant with ischemia be rejected from receiving a master qualification, it appears from the language of the agency's decisions in this case that the presence of ischemia is a condition the Coast Guard routinely finds disqualifies an applicant. Plaintiff attached a presentation to his moving papers that shows that the Coast Guard is considering revising NVIC 04-08, and that, in the future, previously diagnosed, well-controlled medical conditions may not bar an application. (*See* Pl.'s Opp'n at 66.)[8] Simply because the NMC and Coast Guard may allow patients with ischemia to receive a master's license in the future does not mean that the agency is not currently consistent in denying such applicants a master's license. The Court finds that this factor slightly weighs towards giving the agency more deference under *Skidmore*.[9]

Turning to the validity of the agency's reasoning and the ultimate persuasiveness of its arguments, the Court finds that the agency's determination is extremely persuasive. Plaintiff underwent several

---

[8] Although the Court previously determined that it would not rely on supplemental documents outside the Administrative Record, defendants conceded that the Court may take judicial notice of this document. (*See* Defs.' Reply at 4.)

[9] Even if this factor were neutral, the Court would still determine that the agency is entitled to the same amount of deference.

exams by cardiologists, each one pointing to the presence of ischemia. The Coast Guard stated that "even in the absence of symptoms," ischemia "puts [patients] at risk for sudden cardiac death or myocardial infarction after undergoing [coronary artery bypass grafting]." (R. at 2.) The Court concludes that the presence of a potentially serious heart condition in multiple examinations is a persuasive reason for withholding a merchant mariner license as a master, a qualification that could place lives in grave danger if plaintiff experienced symptoms of his ischemia while at sea. The reasonableness of the Coast Guard's determination is further buttressed by the fact that, when the Coast Guard contacted plaintiff's treating cardiologist, the cardiologist was unable to provide any assurance that the plaintiff did not have an increased risk of incapacitation or death due to his heart condition.

In its final decision, the Coast Guard also stated:

> As part of the review of your appeal I considered your conditions in light of the medical standards of the Federal Motor Carrier Safety Administration (FMCSA). FMCSA also conducts medical evaluations of their applicants. The decision made by the NMC is consistent with FMCSA's safety determinations for persons with your conditions. While these standards are not binding on the Coast Guard they do demonstrate a consistent approach to transportation safety.

(R. at 2.) Plaintiff argues that one of the reasons the Coast Guard's decision was not reasonable or persuasive was because of this comparison with licensing for commercial drivers. (Pl.'s Opp'n at 18.) Because the

Coast Guard did not rely on the medical standards of the FMCSA, this comparison was reasonable, and further demonstrates that the Coast Guard took great care in adjudicating plaintiff's application.

For the reasons stated above, the Court finds that the agency's decision is entitled to deference under *Skidmore* and must be upheld. Plaintiff argues that several studies prove that he is not at risk for a sudden cardiac event. The role of the federal court in reviewing determinations under the APA is not to put itself in the shoes of the reviewing doctor and determine *de novo* whether plaintiff is actually at risk. Instead, *Skidmore* articulates the factors that the court should consider in determining what deference should be given to the agency's determination. Here, doctors from the NMC and the Coast Guard reviewed plaintiff's literature, and determined based on these studies and their medical knowledge that plaintiff's ischemia presented a risk to maritime safety.[10] Because the Coast

---

[10] Plaintiff also argues that many studies he submitted are missing from the administrative record and should be considered by this Court. (Pl.'s Reply at 8-10.) As noted *supra*, plaintiff has provided no basis (such as bad faith) to consider documents outside the administrative record in this case. In an abundance of caution, the Court has reviewed the conclusions of the additional studies plaintiff has provided. Although these studies appear to support the proposition that individuals who undergo coronary artery bypass graft enjoy similar morbidity rates as the general population, the studies do not conclude that the presence of ischemia does not place individuals at any increased risk of an incapacitating cardiac event. In fact, Dr. Buggs, the Coast Guard's Medical Officer, addressed similar studies submitted by plaintiff in the administrative record. (*See, e.g.*, R. at 5 ("None of the articles supplied by Mr. Clifford address the risk of acute cardiac events in patients who have undergone a CABG but now have a myocardial perfusion scan documenting an area of ischemia. The fact remains that inducible ischemia, documented by stress testing, stress echocardiogram or by stress myocardial perfusion imaging, is highly

Guard's decision was thorough and persuasive, it receives *Skidmore* deference and should be upheld.

## IV. DUE PROCESS VIOLATION

To the extent that plaintiff continues to assert a Fifth Amendment due process claim (*see* Pl.'s Reply at 20), plaintiff has demonstrated no basis for relief. While plaintiff does not state how the agency violated the Fifth Amendment, construing the *pro se* plaintiff's pleading and motion papers liberally, it appears that he is arguing that the government deprived him of his property interest in an MMC as a master without due process of law.

The Supreme Court has stated that "[t]he procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': To have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (internal citation and quotation marks omitted). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Id.* (internal citation omitted). Plaintiff does not have a protected entitlement to an MMC because the statute and regulations grant the agency the discretion to issue or deny licenses. *See Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 338 (D.C. Cir. 2011) (holding that an individual cannot assert a Fifth Amendment violation when a regulation grants the Coast Guard discretion over his appointment as an unaffiliated, independent pilot).

Even if plaintiff did have a protected entitlement, he received adequate due process. Plaintiff's application was reviewed by multiple individuals and departments within the Coast Guard, and he was given the opportunity to not only submit medical studies and present evidence, but to have his cardiologist speak to someone at the agency on his behalf. Therefore, plaintiff's claim is without merit.

## V. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for judgment on the pleadings and denies plaintiff's motion for summary judgment. Plaintiff's request for fees and other expenses pursuant to the Equal Access to Justice Act is denied as moot because plaintiff is not the "prevailing party" in this action. 28 U.S.C. § 2412(d)(1)(A). The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: January 10, 2013
       Central Islip, NY

\* \* \*

Plaintiff is appearing *pro se*. Defendants are represented by Loretta E. Lynch, United States Attorney, by Thomas A. McFarland, Assistant United States Attorney, 610 Federal Plaza, Central Islip, New York 11722.

---

predictive of future adverse cardiac events such as myocardial infarction or cardiac death.").)